## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK AYERS, Derivatively on Behalf of MOBILEYE GLOBAL, INC., <br><br> Plaintiff, <br> v. <br><br> AMNON SHASHUA, EYAL DESHEH, PATRICK P. GELSINGER, JON M. HUNTSMAN, JR., CLAIRE C. MCCASKILL, CHRISTINE PAMBIANCHI, FRANK D. YEARY, SAF YEBOAH-AMANKWAH, ANAT HELLER, MORAN SHEMESH ROJANSKY, and INTEL CORPORATION, <br><br> Individual Defendants, <br> -and- <br><br> MOBILEYE GLOBAL, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. 1:24-cv-2791 <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Patrick Ayers ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant Mobileye Global, Inc. ("**Mobileye**" or the "**Company**"), submits this Verified Stockholder Derivative Complaint for breach of fiduciary duties, unjust enrichment, and violations of Section 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Mobileye against members of its board of directors (the "**Board**"), members of upper management, and Intel Corporation ("**Intel**"), the Company's controlling stockholder. The wrongdoing alleged herein has caused substantial damage to Mobileye's reputation, goodwill, and standing in the business community, and has exposed Mobileye to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have also damaged Mobileye in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by Mobileye's directors, officers, and controlling stockholder, Intel, from January 26, 2023, through the present (the "**Relevant Period**").

2.      Mobileye is a technology company that develops and deploys advanced driver assistance systems ("**ADAS**") as well as autonomous driving software and hardware products. The Company generates a majority of its revenue from selling EyeQ® System-on-Chips ("**SoCs**").[1] The EyeQ® SoCs is a computer chip used for driver-assistance and partial autonomous driving. Mobileye sells EyeQ® SoCs to Tier 1 automotive suppliers who in turn sell to Original Equipment Manufacturers ("**OEMs**").[2]

3.      The Company was founded by Defendant Amnon Shashua in Israel in 1999 and, in 2014, completed an initial public offering ("**IPO**") as a foreign private issuer. In 2017, Intel acquired Mobileye for $15.3 billion, after which the Company became a wholly owned subsidiary

---

[1] A System-on-Chip is an integrated circuit that combines all the components and functions of a computer or electronic system into a single chip.

[2] An automotive OEM is a company which designs, brands, and distributes vehicles. For example, Ford, BMW, or General Motors are OEMs.

of Intel. After completing an internal reorganization, Mobileye again went public, completing its IPO on October 28, 2022. At its IPO price of $21 per share, Mobileye was valued at $17 billion.

4.     Intel, however, retained control over Mobileye after the October 2022 IPO, holding approximately 750 million shares of the Company's Class B stock, which has 10 times the voting power of Class A stock.

5.     As detailed below, the Board oversaw improper sales practices and abdicated their fiduciary duties in service of the self-interest of the Company's controlling stockholder, Intel, during the Relevant Period.

6.     Specifically, the Individual Defendants failed to disclose to investors that: (i) to avoid the shortages experienced amid supply chain constraints in 2021 and 2022, the Company's Tier 1 customers during fiscal 2023 purchased inventory in excess of demand; (ii) as a result, the Company's customers had excess inventory on hand, including 6 to 7 million units of EyeQ® SoCs; (iii) due to the build-up of inventory, there was a significant risk that the Tier 1 customers would buy less product going forward, thus adversely affecting the Company's fiscal 2024 financial results; and (iv) Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.     While the Company was harmed by the Individual Defendants' wrongful conduct, Intel fared much better. During the Relevant Period, the Individual Defendants took advantage of their knowledge of adverse material nonpublic information ("**MNPI**") to arrange for Intel, the Company's controlling stockholder, to sell a portion of its holdings at inflated prices pursuant to a secondary public offering ("**SPO**"), reaping almost **$1.6 billion** in profits at the expense of Mobileye. The Company admits that it did not receive any proceeds from the SPO even though it paid for the issuance of its own stock.

8.      Intel, which owed fiduciary duties to Mobileye by virtue of being the Company's controlling stockholder, had a motive to abuse its position as the controlling stockholder of the Company in order to maximize the price at which it could sell down its stake in the Company, cashing in almost $1.6 billion of its holdings of Mobileye common stock before the market learned of the Company's false and misleading statements. Intel is a defendant in this case.

9.      Prior to the market opening on January 4, 2024, Mobileye issued a press release stating that it had "become aware" of a build-up of excess inventory including approximately 6 to 7 million units of EyeQ® SoCs held by customers. The Company said that this was a result of "supply chain constraints in 2021 and 2022 and a desire to avoid part shortages" and "lower than-expected production at certain OEM's during 2023." The Company also stated that "the lower-than-expected volumes in the EyeQ® SoC business w[ould] have a temporary impact on [its] profitability[.]" The Company provided its financial forecast for 2024 and said it "expect[s] Q1 revenue to be **down approximately 50%**, as compared to the $458 million revenue generated in the first quarter of 2023."[3]

10.     These unexpected disclosures caused Mobileye's stock price to decline $9.75 per share, or 24.5%, to close at $29.97 per share on January 4, 2024, on high trading volume. The associated loss in market capitalization was nearly $7.9 billion. Had Intel held its stock on this date, the 38.5 million shares that it sold in the SPO would have been worth $1.2 billion rather than $1.6 billion.

11.     As detailed herein, and as alleged in the ongoing federal securities class action pending in the United States District Court for the Southern District of New York, styled *Le v. Mobileye Global, Inc. et al.*, Case No. 1:24-cv-01390, (the "**Federal Securities Class Action**"),

---

[3] All emphasis herein is added unless otherwise noted.

Mobileye's officers and directors substantially damaged the Company by issuing false and misleading statements set forth herein.

12.     Through this derivative action, Plaintiff seeks to recover damages to Mobileye caused by the misconduct alleged herein and all equitable and monetary relief from Intel and other defendants that violated their fiduciary duties in service of their personal interests.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raises federal questions under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

15.     The court has personal jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District because the Company is incorporated in this District, Intel is incorporated in this District, and Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

17.     Plaintiff Patrick Ayers is and has continuously been a stockholder of Mobileye during the wrongdoing complained of herein.

**Nominal Defendant**

18.    Defendant Mobileye is a Delaware corporation with its principal executive offices located in Jerusalem, Israel. Mobileye's shares trade on the Nasdaq Global Select Market ("**NASDAQ**") under the ticker symbol "MBLY".

**Director Defendants**

19.    Defendant Amnon Shashua ("**Shashua**") is Mobileye's co-founder and has served as the Company's President and Chief Executive Officer ("**CEO**") since 2017. Moreover, he has served as a Director of Mobileye since the Company's founding in 1999. He also served as Senior Vice President at Intel from 2017 to 2022, following the Company's acquisition by Intel. By virtue of the Company's relationship with Intel and Intel's ability to control the vote of electing all the Company's directors, Defendant Shashua was beholden to Defendant Intel and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

20.    Defendant Eyal Desheh ("**Desheh**") has served as a director of Mobileye since October 2022. Desheh is also Chair of the Company's Audit Committee and a member of the Compensation Committee. Defendant Desheh knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

21.    Defendant Patrick P. Gelsinger ("**Gelsinger**") has served as the Chair of the Board since September 2022. Since February 2021, he has also served as CEO and a director of Intel, where he spent the first 30 years of his career. Gelsinger's career started at Intel where he spent 30 years in a variety of roles including leader of Desktop Products Group, Senior Vice President, Chief Technology Officer from 2002 to 2005, and Senior Vice President and Co-General Manager

of the Digital Enterprise Group from 2005 to September 2009. By virtue of the Company's relationship with Intel and Intel's ability to control the vote of electing all the Company's directors, Defendant Gelsinger was beholden to Defendant Intel and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

22.     Defendant Jon M. Huntsman, Jr. ("**Huntsman**") has served as a director of Mobileye since October 2022. He is also a member of the Nominating and Corporate Governance Committee of the Board. From June 2021 to April 2022, Huntsman served as Vice Chair of Intel's Government Affairs Advisory Committee. By virtue of the Company's relationship with Intel and Intel's ability to control the vote of electing all the Company's directors, Defendant Huntsman was beholden to Defendant Intel and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

23.     Defendant Claire McCaskill ("**McCaskill**") has served as a director of Mobileye since October 2022. McCaskill is also a member of the Company's Audit Committee. Defendant McCaskill knowingly, in bad faith, or in conscious disregard for her duties caused or allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

24.     Defendant Christine Pambianchi ("**Pambianchi**") has served as a director of Mobileye since October 2022. She is also Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Pambianchi has served as Executive Vice President and Chief People Officer at Intel since 2021. Accordingly, the Company admits that Pambianchi is not an independent director. By virtue of the Company's relationship with Intel

and Intel's ability to control the vote of electing all the Company's directors, Defendant Pambianchi was beholden to Defendant Intel and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

25.     Defendant Frank D. Yeary ("**Yeary**") has served as a director of Mobileye since October 2022. Yeary is also a member of both the Audit Committee and the Compensation Committee. Defendant Yeary has been an Intel director since March 2009 and was named Chair of Intel's board of directors in January 2023. By virtue of the Company's relationship with Intel and Intel's ability to control the vote of electing all the Company's directors, Defendant Yeary was beholden to Defendant Intel and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

26.     Defendant Saf Yeboah-Amankwah ("**Yeboah-Amankwah**") has served as a director of Mobileye since October 2022. He is also Chair of the Nominating and Corporate Governance Committee. Yeboah-Amankwah has also served as Senior Vice President and Chief Strategy Officer at Intel since 2020. Accordingly, the Company admits that he is not an independent director. Defendant Yeboah-Amankwah was beholden to Defendant Intel and/or knowingly, recklessly, or with gross negligence allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

27.     Collectively, Defendants Shashua, Desheh, Gelsinger, Huntsman, McCaskill, Pambianchi, Yeary, and Yeboah-Amankwah are referred to herein as the "**Director Defendants**."

8

**Officer Defendants**

28.     Defendant Anat Heller ("**Heller**") joined Mobileye in April of 2008 and served as the Company's Chief Financial Officer ("**CFO**") from 2018 until June 26, 2023. Defendant Heller knowingly, in bad faith, or in conscious disregard for her duties caused or allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

29.     Defendant Moran Shemesh Rojansky ("**Rojansky**") has served as Mobileye's CFO since September 11, 2023, and previously served as Mobileye's interim CFO from June 26, 2023, until September 11, 2023. She joined Mobileye in 2016, serving as Corporate Controller, Director of Finance, and Vice President of Finance until her appointment as interim CFO in 2023. Defendant Rojansky knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to engage in the publishing of false and misleading statements to artificially increase the Company's share price for Intel to reap in large profits.

30.     Together with the Director Defendants, Heller and Rojansky are referred to herein as the "**Individual Defendants**."

**Controlling Stockholder Defendant**

31.     Defendant Intel is a Delaware corporation with its principal executive offices at 2200 Mission College Boulevard, Santa Clara, California 95054. Intel is a technology and computer chip manufacturing company. Intel acquired the Company in 2017, but announced in December 2021 that it would spin out Mobileye. As of April 28, 2023, Defendant Intel owned 100% of the Company's Class B common stock, equaling 99.3% of the Company's total voting power. While in possession of material, nonpublic information concerning the Company's true

financial health, Defendant Intel sold 38,500,000 shares of its personally held Mobileye stock for proceeds of nearly $1.6 billion.

32.     As noted in the Company's annual report for the fiscal year ending December 30, 2023 filed on Form 10-K with the SEC on February 23, 2024, "Intel is able to control all matters submitted to [the Company's] stockholders for approval, including the election of [the Company's] directors and the approval of significant corporate transactions." In the Company's Proxy Statement filed with the SEC on April 28, 2023, the Company again admits, "[t]hrough its control of shares of common stock representing a majority of the votes entitled to be cast in the election of directors, Intel has the ability to control the vote to elect all of [the Company's] directors."

## SUBSTANTIVE ALLEGATIONS

33.     Mobileye is a technology company engaged in the development and deployment of ADAS and autonomous driving technologies and solutions, including software and hardware technologies. The Company generates the majority of its revenue from the sale of EyeQ® SoCs to OEMs through sales to automotive suppliers.

34.     Throughout the Relevant Period, the Individual Defendants caused the Company to issue a series of false and misleading statements that caused the Company to suffer substantial damages. Intel, however, as the Company's controlling stockholder, benefitted from these false and misleading statements through its representatives on the Board.

35.     On January 26, 2023, Mobileye issued a press release announcing its fourth quarter and full year 2022 results, stating, in relevant part:

> Our fourth quarter performance is an excellent example of how **ramping volumes of our advanced solutions can impact financial performance, as higher average system price amplified strong volume growth, leading to 59% overall revenue growth**, said Mobileye President and CEO Prof. Amnon Shashua.

* * *

**Business development activity was very robust in 2022. As disclosed in our CES presentation, projected future revenue (through 2030) from design wins achieved in just 2022 alone totaled $6.7 billion across 63.6 million incremental units**. This is more than 3.5x the revenue we generated in 2022 and the projected average system price indicates strong traction for our advanced solutions.

We continue to execute very well in our core ADAS business, as we launched systems into 233 distinct vehicle models in 2022 and pricing and gross profit per unit remained consistent with historical levels.

\* \* \*

**Revenue of $565 million increased 59% as compared to fourth quarter of 2021. EyeQ® SoC-related revenue grew 48% in the quarter due to a combination of volume and ASP growth.** The remaining growth was primarily generated by SuperVisionTM related revenue, despite this product being less than 1% of our overall unit volume.

36.    On March 9, 2023, Mobileye filed with the SEC its annual report on Form 10-K for

the fiscal year ended December 31, 2022 (the "**FY22 10-K**"). The FY22 10-K reported:

**To mitigate these supply chain constraints, management is monitoring inventory levels on an ongoing basis.** Although we cannot fully predict the length and the severity of the impact these pressures will have on a long-term basis, **we do not anticipate that our current supply chain constraints would materially adversely affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis**.

\* \* \*

As of December 31, 2022, our solutions had been installed in approximately 800 vehicle models (including local country, year, and other vehicle model variations), and our System-on-Chips ("SoCs") had been deployed in over 135 million vehicles. **We are actively working with more than 50 Original Equipment Manufacturers ("OEMs") worldwide on the implementation of our ADAS solutions. For the year ended December 31, 2022, we shipped approximately 33.7 million of our EyeQ® SoC and SuperVisionTM systems, of which the substantial majority were EyeQ® SoCs**. This represents an increase from approximately 28.1

11

million systems that we shipped in 2021 and approximately 19.7 million systems that we shipped in 2020.

37.     The FY22 10-K was signed by Defendants Shashua, Heller, Gelsinger, Desheh, Huntsman, McCaskill, Pambianchi, Yeary, and Yeboah-Amankwah.

38.     Heller also signed a certification, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("**SOX**"), that, among other things, the FY22 10-K did "not contain any untrue statement of a material fact or omit to state a material fact…" Both Heller and Shashua also certified, pursuant to Section 906 of SOX, that the information contained in the FY22 10-K "fairly presents, in all material respects, the financial condition and result of operations of Mobileye Global Inc."

39.     On April 27, 2023, Mobileye issued a press release announcing its first quarter 2023 results and updated fiscal 2023 guidance, stating, in relevant part:

> The business performed very well in Q1, **including 16% revenue growth as both our EyeQ® and SuperVision business lines grew strongly**, significantly outperforming underlying global auto production growth.
>
> * * *
>
> **Revenue of $458 million increased 16% compared to the first quarter of 2022. EyeQ® SoC related revenue grew 11% in the quarter due to a combination of volume and ASP growth.**

40.     On May 11, 2023, Mobileye filed with the SEC its quarterly report on Form 10-Q for the period ended April 1, 2023 (the "**1Q23 10-Q**"). The 1Q23 10-Q reported key factors affecting the Company's performance, including "**[s]upply and manufacturing capacity**", stating, in relevant part:

> To mitigate these supply chain constraints, **management is monitoring inventory levels on an ongoing basis**. Although we cannot fully predict the length and the severity of the impact these pressures will have on a long-term basis, **we do not anticipate that**

> **our current supply chain constraints would materially adversely affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis.**

41.    The 1Q23 10-Q also described the status of Mobileye's OEM facilities, stating, in relevant part:

> **We are actively working with more than 50 [OEMs] worldwide on the implementation of our ADAS solutions. In the three months ended April 1, 2023, we shipped approximately 8.1 million of our systems, the substantial majority of which were EyeQ® SoCs.** This represents an increase from the approximately 7.4 million of our systems that we shipped in the first three months of 2022.

42.    The 1Q23 10-Q was signed by Defendants Shashua and Heller.  Both Shashua and Heller also signed certifications, pursuant to Section 302 of SOX, that, among other things, the 1Q23 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact." Pursuant to Section 906 of SOX, Defendants Shashua and Heller also certified that the information contained in the 1Q23 10-Q "fairly presents, in all material respects, the financial condition and result of operations of Mobileye Global Inc."

43.    On July 27, 2023, Mobileye issued a press release announcing its second quarter 2023 results and updated guidance, stating, in relevant part:

> The business again performed well in Q2. Operating margin improved as compared to the first quarter of 2023 despite relatively consistent revenue and we're positioned well for the increased revenue growth in the 2nd half of 2023 indicated by our guidance, said Mobileye President and CEO Prof. Amnon Shashua.

> * * *

> **Revenue of $454 million decreased 1% compared to the second quarter of 2022. As noted on our prior earnings call, de-stocking of SuperVision units at our main customer was a headwind in the quarter**.

> * * *

> **Operating cash flow for the six months ended July 1, 2023 was $197 million. This included significant outflows related to re-building our strategic inventory of EyeQ chips which had been significantly reduced during the semiconductor supply chain crisis in 2021 and 2022. Cash used in purchases of property and equipment was $58 million for that same period.**

44.     On August 10, 2023, Mobileye submitted to the SEC its quarterly report on Form 10-Q for the period ended July 1, 2023 (the "**2Q23 10-Q**"). The 2Q23 10-Q described the Company's supply and manufacturing capacity and stated, in relevant part:

> **To mitigate these supply chain constraints, management monitors inventory levels on an ongoing basis.** Although we cannot fully predict the length and the severity of the impact these pressures may have on a long-term basis, **we do not anticipate that potential supply chain constraints would materially adversely affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis.**

45.     The 2Q23 10-Q also reported the status of Mobileye's OEM facilities, stating, in relevant part:

> We are actively working with more than 50 [OEMs] worldwide on the implementation of our ADAS solutions. **In the six months ended July 1, 2023, we shipped approximately 16.4 million of our systems, the substantial majority of which were EyeQ® SoCs. This represents an increase from the approximately 15.9 million of our systems that we shipped in the six months ended July 2, 2022.**

46.     The 2Q23 10-Q also cited key factors affecting Mobileye's performance, stating, in relevant part:

> In addition, **in prior periods**, certain Tier 1 customers increased their orders for components and parts, including our solutions, to counteract the impact of supply chain shortages for auto parts, and **we expect these Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods. As a result, some demand for our solutions and the corresponding revenue from these customers**

**were shifted to earlier time periods than otherwise would have occurred absent a general supply chain shortage and inflationary environment.** We cannot predict when the impact of these factors on global vehicle production will substantially diminish. However, ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased, and we believe that we will continue to benefit from that trend. Our revenue of $912 million in the six months ended July 1, 2023 was up 7% year-over-year.

47.     The 2Q23 10-Q was signed by Defendants Shashua and Rojansky.  Both Shashua and Rojansky also signed certifications, pursuant to Section 302 of SOX, that, among other things, the 2Q23 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact." Pursuant to Section 906 of SOX, Defendants Shashua and Rojansky also certified that the information contained in the 2Q23 10-Q "fairly presents, in all material respects, the financial condition and result of operations of Mobileye Global Inc."

48.     On October 26, 2023, Mobileye issued a press release announcing its third quarter 2023 results and updated guidance, stating, in relevant part:

> We are very pleased with Q3 results, as operating leverage on strong revenue growth has led to significant increases in operating income, said Mobileye President and CEO Prof. Amnon Shashua.
>
> * * *
>
> **Revenue of $530 million increased by 18% compared to the third quarter of 2022, primarily due to a combination of volume and ASP growth in our EyeQ® chip related revenue.**
>
> * * *
>
> **Operating cash flow for the nine months ended September 30, 2023 was $285 million. This included significant outflows related to re-building our strategic inventory of EyeQ chips, which had been significantly reduced during the semiconductor supply chain crisis in 2021 and 2022. Cash used in purchases of property and equipment was $75 million for that same period.**

49.     On November 9, 2023, Mobileye submitted to the SEC its quarterly report on Form 10-Q for the period ended September 30, 2023 (the "**3Q23 10-Q**"). The 3Q23 10-Q reported the Company's supply and manufacturing capacity and stated, in relevant part:

> **To mitigate these supply chain constraints, management monitors inventory levels on an ongoing basis.** Although we cannot fully predict the length and the severity of the impact these pressures may have on a long-term basis, **we do not anticipate that potential supply chain constraints would materially adversely affect our results of operations, capital resources, sales, profits, and liquidity on a long-term basis**.

50.     The 3Q23 10-Q also reported the status of Mobileye's OEM facilities, stating, in relevant part:

> We are actively working with more than 50 [OEMs] worldwide on the implementation of our ADAS solutions. **In the nine months ended September 30, 2023, we shipped approximately 25.9 million of our systems, the substantial majority of which were EyeQ® SoCs. This represents an increase from the approximately 24.0 million of our systems that we shipped in the nine months ended October 1, 2022.**

51.     The 3Q23 10-Q also stated the following, in relevant part, regarding key factors affecting the Company's performance:

> In addition, **in prior periods**, certain Tier 1 customers increased their orders for components and parts, including our solutions, to counteract the impact of supply chain shortages for auto parts, and we expect these Tier 1 customers will utilize accrued inventory on hand before placing new orders to meet the demand of OEMs in current or future periods. **As a result, some demand for our solutions and the corresponding revenue from these customers were shifted to earlier time periods than otherwise would have occurred absent a general supply chain shortage and inflationary environment.** We cannot predict when the impact of these factors on global vehicle production will substantially diminish. **However, ADAS volumes have grown faster in recent years than the overall automotive market as ADAS penetration rates have increased, and we believe that we will continue to benefit from that trend.** Our revenue of $1,442 million in the nine months ended September 30, 2023 was up 11% year-over-year.

52.     The 3Q23 10-Q was signed by Defendants Shashua and Rojansky. Both Shashua and Rojansky also signed certifications, pursuant to Section 302 of SOX, that, among other things, the 3Q23 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact." Pursuant to Section 906 of SOX, Defendants Shashua and Rojansky also certified that the information contained in the 3Q23 c 10-Q "fairly presents, in all material respects, the financial condition and result of operations of Mobileye Global Inc."

53.     The statements identified above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) to avoid the shortages experienced amid supply chain constraints in 2021 and 2022, the Company's Tier 1 customers had purchased inventory in excess of demand during fiscal 2023; (ii) as a result, the Company's customers had excess inventory on hand, including approximately 6 to 7 million units of EyeQ® SoCs; (iii) due to the build-up of inventory, there was a significant risk that the Tier 1 customers would buy less product, thus adversely impacting the Company's fiscal 2024 financial results; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Emerges**

54.     On January 4, 2024, before the market opened, Mobileye issued a press release, revealing it had "become aware" of a build-up of excess inventory including an estimated 6 to 7 million units of EyeQ® SoCs held by customers and that, as a result, "the lower-than-expected volumes in the EyeQ® SoC business will have a temporary impact on our profitability" such that the Company "expect[s] Q1 revenue to be down approximately 50%, as compared to the $458 million revenue generated in the first quarter of 2023."

17

55.     The press release, entitled "Preliminary FY2023 Financial Results and Initial 2024

Outlook", stated, in relevant part:

> As a result of our standard planning process for the upcoming year, including discussions with our Tier 1 customers to determine potential orders for 2024, **we have become aware of excess inventory at our customers**, **which we believe to be 6-7 million units of EyeQ® SoCs**. **Based on our discussions, we understand that much of this excess inventory reflects decisions by Tier 1 customers to build inventory in the Basic ADAS category due to supply chain constraints in 2021 and 2022 and a desire to avoid part shortages, as well as lower than-expected production at certain OEM's during 2023.** As supply chain concerns have eased, we expect that our customers will use the vast majority of this excess inventory in the first quarter of the year. **As a result, we expect that first quarter 2024 revenue will be significantly below first quarter 2023 revenues and that we will see revenue normalized during the remainder of 2024.**
>
> In FY2024 we expect total revenue in the range of $1,830 - $1,960 million. This is underpinned by expected EyeQ® shipments of 31 – 33 million units (as compared to approximately 37m units in 2023) and SuperVision shipments of 175k – 195k units (as compared to approximately 100k units in 2023).
>
> **We currently expect Q1 revenue to be down approximately 50%, as compared to the $458 million revenue generated in the first quarter of 2023.** We also currently believe that revenue over the balance of the year will be impacted by inventory drawdowns to a much lesser extent. As a result, we expect revenue for Q2 through Q4 2024 on a combined basis to be roughly flat to up mid single digits as compared to the same period in 2023, and we expect inventory at our customers to be at normal levels by the end of 2024.
>
> **We anticipate that the lower-than-expected volumes in the EyeQ® SoC business will have a temporary impact on our profitability.** Similar to revenue, we expect Q1 profit levels to be significantly below the subsequent quarters. We expect Q1 2024 Operating Loss to be in the range of $257 to $242 million. Excluding amortization of intangible assets and stock-based compensation, we expect Adjusted Operating Loss in the range of $80 to $65 million in the first quarter of 2023.

56. On this news, Mobileye's stock price fell $9.75 per share, **or 24.5%**, to close at $29.97 per share on January 4, 2024, on unusually heavy trading volume.

## INSIDER SALES BY DEFENDANT INTEL

57. Rather than providing the market with correct information, Defendant Intel used its knowledge of Mobileye's MNPI to sell its personal holdings before the truth was shared with the market and the price of Mobileye's common stock dropped. As the controlling stockholder of Mobileye, Defendant Intel was privy to MNPI about Mobileye's true business health.

58. On June 12, 2023, while in possession of inside knowledge from its directors on the Board, Defendant Intel sold 38,500,000 shares of its personally held Mobileye stock pursuant to an SPO for proceeds of nearly $1.6 billion. This sale took place approximately one month after Mobileye announced its financial results for the first quarter of fiscal 2023 and filed the 1Q23 10-Q. Defendant Intel's sales were timed to maximize profit from Mobileye's then artificially inflated stock price.

## FIDUCIARY DUTIES

36. By reason of their positions as officers of the Company, each of the Individual Defendants owed and continue to owe Mobileye and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Mobileye in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Mobileye and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

59. Each Individual Defendant owes and continues to owe Mobileye, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Mobileye, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Mobileye, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

61.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York and the United States, and pursuant to Mobileye's own Code of Business Conduct and Ethics;

(c)     Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     Remain informed as to how Mobileye conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Mobileye and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement and adequate and functioning system of internal legal, financial, and management controls, such that Mobileye's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

62.    The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Mobileye.

63.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Mobileye and were at all times acting within the course and scope of such agency.

**Duties Pursuant to the Company's Code of Business Conduct**

64.    The Individual Defendants, as officers and/or directors of Mobileye, were bound by the Company's Code of Business Conduct (the "**Code of Conduct**").[4]

65.    The Code of Conduct indicates that it "sets out basic principles to guide all directors, officers, employees and consultants of Mobileye Global Inc. and its subsidiaries" and that "[a]ll directors, officers, employees and consultants of the Company must conduct themselves accordingly and seek to avoid even the appearance of improper behavior." It also notes that it should "be provided to and followed by the Company's other agents and representatives."

66.    The Code of Conduct provides, in relevant part, as follows:

> 3. Compliance With Applicable Laws, Rules and Regulations
>
> Obeying the law is the foundation on which the Company's ethical standards are built. You must comply with applicable laws, rules and regulations.
>
> * * *
>
> 6. Public Disclosure of Information
>
> * * *
>
> The Company expects all directors, officers and employees who are responsible for the preparation of SEC reports or other public documents or the contribution of information for such reports or documents, to ensure that the information disclosed in those

---

[4] Mobileye Global Inc. Code of Business Conduct (Sept. 7, 2023), https://ir.mobileye.com/static-files/43e281ed-94d0-435e-90b7-ec78a928def7#:~:text=Violence%20and%20threatening%20behavior%20of,workplace%20will%20not%20be%20tolerated.

documents is accurate, reliable and complete and disclosure is made on a timely basis.

\* \* \*

7. Insider Trading

You are not permitted to use or share confidential information for stock trading purposes or for any other purpose, except the conduct of our business. All non-public information about the Company should be considered confidential information. To use 'material non-public information' about the Company or the market for the Company's securities for personal financial benefit or to 'tip' others who might make an investment decision on the basis of this information is not only unethical, but also illegal, and could result in criminal prosecution in addition to the termination of your employment…

\* \* \*

8. Corporate Opportunities

You are prohibited from taking for yourself opportunities that are discovered through the use of corporate property, information or position without the informed prior consent of the Board. You may not use corporate property or information obtained through your position with the Company for improper personal gain, and you may not compete with the Company directly or indirectly. Furthermore, you owe a duty to the Company to advance its legitimate interests when such an opportunity arises.

67.     The Individual Defendants failed to adhere to the Code of Conduct when they failed to ensure that "accurate, reliable, and complete" information was disclosed in the SEC reports and/or other public documents regarding the Company's customers' excess purchases of inventory during FY 2023. They also failed to disclose that, as a result of these excess purchases, there would be a high risk that those same customers would buy less product thereby negatively impacting the Company's FY 2024 financial results.

*Duties Pursuant to the Audit Committee Charter*

68.     In addition to these duties, Defendants Desheh, McCaskill, and Yeary (the "**Audit**

23

**Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed

specific duties to Mobileye pursuant to the Audit Committee Charter.

69.     Pursuant to the Audit Committee Charter, the Audit Committee is responsible for,

among other things:

I.     <u>Purposes, Authority and Funding</u>

[O]verseeing the accounting and financial reporting processes of
the Company and its subsidiaries and the audits of the financial
statement of the Company and to perform such further functions as
may be consistent with this Charter or assigned by applicable law,
the Company's certificate of incorporation or the Board.

* * *

1.     Duties and Responsibilities

A.  Financial Statement, Annual Audit and Disclosure Matters

Review[ing] the policies and procedures adopted by the Company
to fulfill its responsibilities regarding the fair and accurate
presentation of financial statements in accordance with United
States GAAP and applicable rules and regulations of the SEC and
Nasdaq[.]

* * *

Review[ing] periodically with the Chief Executive Officer, Chief
Financial Officer and the Company's independent registered
public accounting firm: (a) all significant deficiencies and material
weaknesses in the design or operation of internal control over
financial reporting which are reasonably likely to adversely affect
the Company's ability to record, process, summarize and report
financial information; and (b) any fraud, whether or not material,
that involves management or other employees who have a
significant role in the Company's internal control over financial
reporting[.]

Meet[ing] to review and discuss the Company's annual audited
financial statements and interim financial statements with
management and the Company's independent registered public
accounting firm, including reviewing the Company's specific
disclosures under "Management's Discussion and Analysis of
Financial Condition and Results of Operations[.]

\* \* \*

Review[ing] and discuss[ing] the Company's earnings press
releases (including type and presentation of information, paying
particular attention to any use of "pro forma," or "adjusted" non-
GAAP information), as well as financial information and earnings
guidance provided by the Company to analysts and ratings
agencies (which review may be done generally (e.g., discussion of
the types of information to be disclosed and type of presentations
to be made), and the Committee need not discuss in advance each
earnings release or each instance in which the Company may
provide earnings guidance)[.]

C.  Matters Regarding Oversight of the Company's Internal Audit
    Function

Review[ing] the yearly report prepared by management, and
attested to by the Company's independent registered public
accounting firm, assessing the effectiveness of the Company's
internal control over financial reporting and stating management's
responsibility for establishing and maintaining adequate internal
control over financial reporting prior to its including in the
Company's Annual Report on Form 10-K[.]

Review[ing] the Company's annual audited financial statements
with management, including any major issues regarding
accounting and auditing principles and practices, and review
management's evaluation of the adequacy and effectiveness of
internal controls that could significantly affect the Company's
financial statements, as well as the adequacy and effectiveness of
the Company's disclosure controls and procedures and
management's reports thereon[.]

E.  Additional Duties and Responsibilities

Report[ing] regularly to the Board, and review with the Board any
issues that arise with respect to the quality or integrity of the
Company's financial statements, the Company's compliance with
legal or regulatory requirements, the performance and
independence of the Company's independent registered public
accounting firm, or the performance of the Company's internal
audit function, if implemented[.]

Meet[ing] periodically with the Company's internal legal counsel,
and outside counsel when appropriate, to review any legal and
regulatory matters, including (i) any matters that may have a
material impact on the financial statements of the Company and

(ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Company[.]

* * *

Review[ing] with management and the Company's independent registered public accounting firm any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting[.][5]

70.     While the Audit Committee Charter set forth clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, the Audit Committee Defendants have not fulfilled their responsibilities. In fact, the Audit Committee has gravely harmed the Company by taking part in the publishing of the false and misleading statements described herein regarding the Company's customers' excess purchases of inventory during the 2023 fiscal year. As a result of these excess purchases, there would be a high risk that those same customers would buy less product thereby negatively impacting the Company's FY 2024 financial results.

## THE FALSE AND MISLEADING PROXY STATEMENTS

71.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue a false and misleading Proxy Statement (the "**2023 Proxy**") on April 28, 2023.[6]

72.     The 2023 Proxy recommended, among other things, that shareholders elect Individual Defendants Desheh, Gelsinger, Huntsman, McCaskill, Pambianchi, Shashua, Yeary,

---

[5] *See* Mobileye Global, Inc., Audit Committee Charter (Oct. 26, 2022), https://ir.mobileye.com/static-files/77c4b799-285d-4ee1-b749-130e66699e3b.

[6] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

and Yeboah-Amankwah despite the fact that it states that only four of the Company's eight director-nominees are independent. The 2023 Proxy assured stockholders that the Board and its committees regularly assessed and managed the risks that Mobileye faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. Specifically, the 2023 Proxy stated:

THE BOARD'S ROLE IN RISK OVERSIGHT

An important function of the Board is oversight of risk management at Mobileye. Risk is inherent in business, and the Board's oversight, assessment, and decisions regarding risks occur in the context of and in conjunction with the other activities of the Board and its committees. The Board believes that its current governance structure facilitates its risk oversight responsibilities.

The Board and management consider "risk" to be the possibility that an undesired event could occur that might adversely affect the achievement of our objectives. Risks vary in many ways, including the ability of the company to anticipate and understand the risk, the types of adverse impacts that could result if the undesired event occurs, the likelihood that an undesired event and a particular adverse impact would occur, and the ability of the company to control the risk and the potential adverse impacts.

The Audit Committee manages risk by overseeing the integrity of the Company's financial statements and internal controls; the qualifications, independence and performance of the Company's independent auditor; the performance of the Company's internal audit function; and the Company's compliance with legal and regulatory requirements. The Audit Committee reviews and discusses with the Board and with management the Company's major financial risk exposures and steps taken to monitor and control such exposures.

The Nominating and Corporate Governance Committee manages risk by reviewing and evaluating the size, composition, function and duties of the Board consistent with its needs; overseeing the succession process in the event the Board determines that a new Chief Executive Officer should be hired; making recommendations to the Board as to determinations of director independence; and developing and recommending to the Board

> the Corporate Governance Guidelines, reviewing and reassessing the Code of Business Conduct and Ethics for the Company and overseeing compliance with such Guidelines and Code.
>
> The Compensation Committee manages risk by reviewing and assessing risks arising from the Company's employee compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on the company.

73.     The 2023 Proxy also noted that one of the functions of the Audit Committee was to review the Company's "financial risk and control procedures, compliance programs and significant tax, legal and regulatory matters[.]"

74.     In the Compensation Discussion and Analysis section of the 2023 Proxy, the Company stated that:

> A meaningful portion of executive pay is tied directly to stockholder outcomes and value creation through annual grants of restricted stock units ('RSUs'). [The Company] believe[s] awarding RSUs provides a simple, straightforward approach to tying executives' compensation to our successful business outcomes. As such, annual cash bonuses, perquisites, personal benefits and other compensation elements are not significant elements of the Company's current compensation program.

75.     The 2023 Proxy also noted that "Restricted Stock and RSUs may require the achievement of certain performance goals and/or continued employment with us through a specified vesting period."

76.     It further claimed that the objective of the Company's "compensation program is to attract motivate and retain top talent and drive long-term value."

77.     In the 2023 Proxy, Defendant Shashua was reported to have been paid **almost $75 million** in compensation tied to RSUs. Such compensation was reportedly tied to underlying successful business outcomes and other performance goals though, in reality, the Company had not achieved the claimed outcomes.

78. As a result of the materially false and misleading statements in the 2023 Proxy, the Company's stockholder vote requested by the proxy was uninformed.

## BREACHES OF DUTIES

79. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Mobileye, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

80. The Individual Defendants breached their fiduciary duties by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders.

81. The Audit Committee Defendants had a duty to review the Company's earnings, press releases, and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Mobileye's public statements and internal control functions.

82. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Mobileye, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Mobileye has expended, and will continue to expend, significant sums of money.

## DAMAGES TO MOBILEYE

83. As a direct and proximate result of the Individual Defendants' conduct, Mobileye has expended and will continue to expend significant sums of money.

84.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action filed against the Company for violations of the federal securities laws. Mobileye will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

85.    As a direct and proximate result of the Individual Defendants' conduct, Mobileye has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

87.    Plaintiff brings this action derivatively in the right and for the benefit of Mobileye to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Mobileye, unjust enrichment, and violations of the Exchange Act.

88.    Mobileye is named solely as a nominal party in this action. This is not a collusive action and to confer jurisdiction on the Court that it would not otherwise have.

89.    Plaintiff is, and has been continuously at all relevant times, a stockholder of Mobileye. Plaintiff will adequately and fairly represent the interests of Mobileye in enforcing and prosecuting its rights, and, to that end, as retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

90.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

91.     A pre-suit demand on the Board of Mobileye is futile and, therefore, excused. At the time of filing this action, the Board consists of eight directors: Director Defendants (i) Desheh, (ii) Gelsinger, (iii) Huntsman, (iv) McCaskill, (v) Pambianchi, (vi) Shashua, (vii) Yeary, and (viii) Yeboah-Amankwah.

92.     Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, at least half of the Board (*i.e.* at least four directors) faces a substantial likelihood of liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

### A.  At Least Five of the Eight Directors Are Beholden to Intel

93.     Demand is excused because at least five of the eight directors are interested vis-a-vis Intel, which received a material economic benefit from this alleged misconduct. Specifically, Intel, the Company's largest shareholder, sold over 5% of its shares in the Company at $40.85 per share during the Relevant Period, reaping almost **$1.6 billion**.

94.     Board members Gelsinger, Huntsman, Pambianchi, Yeary, and Yeboah-Amankwah are all affiliated with Intel as either a director, officer, or former officer/director. As a result of these relationships, it would be futile to request that these directors take action against Intel.  Accordingly, because Defendants Gelsinger, Huntsman, Pambianchi, Yeary, and Yeboah-Amankwah lack independence from Intel, which received a material economic benefit from the alleged misconduct, demand is excused as to these directors.

### B.  The Board Faces a Substantial Likelihood of Liability

95.     Demand is excused as to the entire Board, as each of them faces, individually and

collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts regarding the Company's customers' excess purchases of inventory during FY 2023. As a result of these excess purchases, there would be a high risk that those same customers would buy less product thereby negatively impacting the Company's FY 2024 financial results, which the Company did not previously disclose. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

96.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Ther fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, demand would be futile, and thus is excused, as the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

97.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs.

98.    Additionally, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

99.     Each of the Director Defendants authorized, signed, and/or permitted the false statements, including the Company's FY22 10-K, the 1Q21 10-Q, the 2Q21 10-Q, and 3Q21 10-Q, to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it. The Director Defendants breached their fiduciary duties, and face a substantial likelihood of liability. Thus, demand upon all the Director Defendants is futile, and therefore, excused.

100.    The Director Defendants, as members of the Board, were and are subject to Mobileye's Code of Business Conduct. The Director Defendants violated the Code of Business Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile and excused.

101.    Defendant Desheh has served as a Company director since October 2022. The Company provides Defendant Desheh with significant compensation for his role as a director. According to the Company's Proxy Statement filed on April 28, 2023, Defendant Desheh received almost $211,000 for his role as a director.[7] As such, Defendant Desheh cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Desheh renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company

---

[7] *See* Mobileye Global Inc., Proxy Statement (Apr. 28, 2023). https://www.sec.gov/Archives/edgar/data/1910139/000110465923052939/tm2311724d2_def14a.htm.

director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Desheh breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Desheh is futile and excused.

102.    Defendant Gelsinger has served as a Company director since September 2022 and served as Intel's director and CEO since February 2021. From his position as CEO at Intel, Gelsinger was eligible to receive $21.5 million in equity compensation awards according to Intel's Proxy Statement filed on March 28, 2024.[8] Through his positions as a Board member of the Company and director and CEO of Intel, Defendant Gelsinger cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Gelsinger through his position at Intel, which controls almost 100% voting power in the Company renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Gelsinger breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Gelsinger is futile and excused.

103.    Defendant Huntsman has served as a Company director since October 2022 and

---

[8] *See* Intel Corporation, Proxy Statement (Mar. 28, 2024).
https://www.sec.gov/Archives/edgar/data/50863/000005086324000057/intc-20240327.htm#i7dd69183bc66433a9371fc76c7d0360e_5255.

previously served as Vice Chair of Intel's Government Affairs Advisory Committee from June 2021 to April 2022. The Company provides Defendant Huntsman with significant compensation for his role as a director. According to the Company's Proxy Statement filed on April 28, 2023, Defendant Huntsman received almost $211,000 for his role as director. As such, Defendant Huntsman cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence, the financial benefits received by Defendant Huntsman, and the fact that he was a former officer at Intel renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Huntsman breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Huntsman is futile and excused.

104.    Defendant McCaskill has served as a Company director since October 2022. The Company provides Defendant McCaskill with significant compensation for her role as a director. According to the Company's Proxy Statement filed on April 28, 2023, Defendant McCaskill received almost $211,000 for her role as a director. As such, Defendant McCaskill cannot independently consider any demand to sue himself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant McCaskill renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the

Company to make false and misleading statements, consciously disregarding her duties to protect corporate assets. As a result, Defendant McCaskill breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant McCaskill is futile and excused.

105. Defendant Pambianchi has served as a Company director since October 2022 and served as Intel's Executive Vice President and Chief People Officer since 2021. Through her positions as a Board member of the Company and Executive Vice President and Chief People Officer of Intel, Defendant Pambianchi cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Pambianchi through her position at Intel, which controls almost 100% voting power in the Company renders her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding her duties to protect corporate assets. As a result, Defendant Pambianchi breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Pambianchi is futile and excused.

106. Defendant Shashua has served as a Company director since its founding in 1999 and CEO and President since 2017. He also served as Senior Vice President at Intel from 2017 to 2022. Therefore, as the Company concedes, he is not an independent under Nasdaq listing rules. The Company provides Defendant Shashua with significant compensation for his role as a director and officer. According to the 2023 Proxy, Defendant Shashua received over $45 million for his role as an officer. In that same statement, he was eligible to receive almost $75 million in

"Compensation Actually Paid to CEO". Through his positions as a board member of the Company and prior role in Intel, Defendant Shashua cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Shashua renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Shashua breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Shashua is futile and excused.

107.    Defendant Yeary has served as a Company director since October 2022 and serves as Intel's chair on its Board of Directors. The Company provides Defendant Yeary with significant compensation for his role as a director. According to the Company's Proxy Statement filed on April 28, 2023, Defendant Yeary received almost $211,000 for his role as a director. Through his positions as a Board member of the Company and chair on Intel's Board of Directors, Defendant Yeary cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Yeary through his position at Intel, which controls almost 100% voting power in the Company renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Yeary breached his fiduciary duties, faces a substantial

likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Yeary is futile and excused.

108.    Defendant Yeboah-Amankwah has served as a Company director since October 2022 and served as Intel's Senior Vice President and Chief Strategy Officer since 2020. Through his positions as a Board member of the Company and Senior Vice President and Chief Strategy Officer of Intel, Defendant Yeboah-Amankwah cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Yeboah-Amankwah through his position at Intel, which controls almost 100% voting power in the Company renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Yeboah-Amankwah breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Yeboah-Amankwah is futile and excused.

109.    Furthermore, Desheh, McCaskill, and Yeary have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of Mobileye's financial statements. Specifically, the Audit Committee Charter provides that the Audit Committee is responsible for:

I. Purposes, Authority and Funding

[O]verseeing the accounting and financial reporting processes of the Company and its subsidiaries and the audits of the financial statement of the Company and to perform such further functions as

may be consistent with this Charter or assigned by applicable law, the Company's certificate of incorporation or the Board;

III. Duties and Responsibilities

E. Additional Duties and Responsibilities

"report[ing] regularly to the Board, and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent registered public accounting firm, or the performance of the Company's internal audit function, if implemented[.]"

110.    In their capacities as Audit Committee members, Desheh, McCaskill, and Yeary reviewed and approved that materially misleading statements and allowed them to be disseminated in Mobileye's SEC filings and other disclosures. Thus, Desheh, McCaskill, and Yeary breached their fiduciary duties, are not disinterested, and demand is excused as to them.

### C.  The Board Lacks Sufficient Independence to Give Disinterested Consideration to Bringing the Claims Herein

111.   The Company's 2023 Proxy notes that it was acquired by Intel and is therefore a subsidiary of Intel.

112.   Defendant Shashua is a director of the Company, and serves as its President and CEO. He was formerly a Senior Vice President at Intel. The Proxy Statement does not designate Shashua as an independent director.

113.   Defendant Gelsinger serves as a director of Mobileye and has been a director and CEO of Intel since February 2021. The Proxy Statement does not designate Gelsinger as an independent director.

114.   Defendant Pambianchi serves as a director of Mobileye and has served as Executive Vice President and Chief People Officer at Intel since 2021. The Proxy Statement does not designate Pambianchi as an independent director.

115.   Defendant Yeary serves as a director of Mobileye and has served as Chair of Intel's board of directors. The Proxy Statement does not designate Yeary as an independent director.

116.   Defendant Yeboah-Amankwah serves as a director of Mobileye and has served as Senior Vice President and Chief Strategy Officer at Intel since 2020. The Proxy Statement does not designate Yeboah-Amankwah as an independent director.

117.   In light of overlapping positions these directors/officers serve on the Company and at Intel, demand upon Gelsinger, Pambianchi, Shashua, Yeary and Yeboah-Amankwah is futile and excused.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

118.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

119.   These Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

120.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

121.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

122.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2023 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

123.    The false and misleading elements of the 2023 Proxy led to the re-elections of the Director Defendants, allowing them to breach their fiduciary duties to Mobileye.

124.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omission in the 2023 Proxy.

125.    Plaintiff, on behalf of Mobileye, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

126.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127.    The individual defendants, by virtue of their positions with Mobileye and their

specific acts, were, at the time of the wrongs alleged herein, controlling persons of Mobileye and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Mobileye to engage in the illegal conduct and practices complained of herein.

128.    Plaintiff, on behalf of Mobileye, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

129.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mobileye's business and affairs as directors and/or officers of the Company.

131.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonably inquiry, oversight, and supervision.

132.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mobileye.

133.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

134.    In breach of their fiduciary duties, the Individual Defendants failed to follow up on "red flags" concerning the misleading statements and omissions alleged herein.

135.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

136.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes, even though conflicting facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

137.    The Audit Committee Defendants breached their duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

138.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mobileye has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to Mobileye.

139.     Plaintiff, on behalf of Mobileye, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

140.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141.     By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Mobileye.

142.     The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Mobileye tied to the performance or artificially inflated valuation of Mobileye, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

143.     Plaintiff, as a stockholder and a representative of Mobileye, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

144.     Plaintiff, on behalf of Mobileye, has no adequate remedy at law.

## FIFTH CLAIM

### Against Intel
*for Breach of Fiduciary Duty*

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    Intel was and is Mobileye's controlling stockholder. Intel has been and remains Mobileye's largest stockholder. As of December 30, 2023, Intel beneficially owns all of the outstanding shares of the Company's Class B common stock, representing approximately 88.3% of all outstanding common stock and 98.7% of the voting power of the Company's common stock, giving Intel control over the Board. Indeed, a majority of the Board, including Defendants Shashua, Gelsinger, Huntsman, Pambianchi, Yeary, and Yeboah-Amankwah, were beholden to Intel, highlighting Intel's control over Mobileye. Further, Intel owns this large stake in Mobileye even after selling approximately **$1.6 billion** of the Company's common stock. Before these sales, as of April 21, 2023, Intel controlled an even greater percentage of the Company's voting power, holding all of the Company's Class B common stock, representing 99.3% of the total voting power. Thus, Intel is Mobileye's controlling stockholder, owing the Company fiduciary duties.

147.    As the controlling stockholder, Intel owed and continues to owe fiduciary duties to Mobileye. By reason of their fiduciary relationships, the Individual Defendants owed and continue to owe Mobileye the highest obligation of care and loyalty.

148.    Intel violated and breached its fiduciary duties.

149.    At relevant times, Intel had the power to control and influence Mobileye and used that power to capture profits at the long-term expense of stockholders. As a result, Intel was able to sell almost **$1.6 billion** in common stock.

150.    As a direct and proximate result of Intel's breaches of its fiduciary obligations,

Mobileye has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, Intel is liable to Mobileye.

151.    Plaintiff, on behalf of Mobileye, has no adequate remedy at law.

## SIXTH CLAIM

### Against Intel
*for Unjust Enrichment*

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    By its wrongful acts, Intel was unjustly enriched at the expense of and to the detriment of Mobileye. Intel unjustly enriched itself by selling almost **$1.6 billion** in Mobileye common stock, inflated as a result of the Company's issuance of the false and misleading statements described herein.

154.    Plaintiff, as a stockholder and representative of Mobileye, seeks restitution from Intel, and seeks an order of this Court disgorging all profits and benefits obtained by Intel from its wrongful conduct and fiduciary breaches.

155.    Plaintiff, on behalf of Intel, has no adequate remedy at law.

## PRAYER FOR RELIEF

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Mobileye, and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.     Finding that the Individual Defendants and have breached their fiduciary duties to Mobileye;

D.     Finding that the Individual Defendants and Intel have been unjustly enriched;

E.     Determining and awarding to Mobileye the damages sustained by it because of the violations set forth above from each of the Individual Defendants and Intel, jointly and severally, together with pre- and post-judgment interest thereon;

F.     Directing Mobileye to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Mobileye and its stockholders from a repeat of the damaging events described herein;

G.     Awarding Mobileye equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Mobileye have an effective remedy;

H.     Awarding Mobileye restitution from Intel and the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Intel and the Individual Defendants, including all ill-gotten gains from insider selling by Intel;

I.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

J.     Granting such other and further relief as the Court may deem just and proper.

Dated: April 12, 2024

**LEVI & KORSINSKY, LLP**

/s/ *Correy A. Suk*
Gregory M. Nespole
Daniel Tepper
Correy A. Suk
33 Whitehall Street, 17th Floor
New York, NY 10004
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com

*Attorneys for Plaintiff Patrick Ayers*

48

## **VERIFICATION**

I, Patrick Ayers, do hereby verify that I am a holder of stock of Mobileye Global, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint").  I have reviewed and authorized the filing of the Complaint.  All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   April 12, 2024

*Patrick Ayers*
Patrick Ayers (Apr 12, 2024 10:41 EDT)
_____
Patrick Ayers